### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **CIVIL ACTION** |
| **OPPORTUNITY COMMISSION** | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 08-5535** |
| | : | |
| **DART CONTAINER** | : | |
| **CORPORATION** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                              **May  31, 2012**

The Equal Employment Opportunity Commission brought this action under Title

VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct

alleged unlawful employment practices that discriminate on the bases of race and national

origin, and to provide appropriate relief to Intervenor Ibrahim A. Al-Badawi.[1]  The

Commission also alleged that a class of similarly-situated employees was discriminated

against when they were not selected or considered for available supervisory positions.  In

addition to Mr. Al-Badawi, the Commission identified and is pursuing claims on behalf

of two other members of the class, i.e., Adrian Bombin and Ulises Roman, both Hispanic

males.  The defendant has filed a motion for summary judgment pursuant to Rule 56 of

---

[1] Mr. Al-Badawi claims that he was adversely affected by the defendant's practices.  He filed a separate complaint as an intervenor, and included a count for a violation of the Pennsylvania Human Relations Act.  See Document #11.  While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts.  Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995).  Accordingly, I shall specifically address only the Title VII claims which analysis applies equally to the PHRA claim.  Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

the Federal Rules of Civil Procedure.  For the reasons that follow, I will grant the motion in its entirety.

# I.  BACKGROUND[2]

The defendant is a producer of polystyrene food service products.  Such products principally consist of foam drinking cups, foam plates, plastic eating utensils, and containers used for carry-out food.  In Pennsylvania, the defendant employs approximately 1500 employees in facilities located in Leola and Lancaster.  It typically manufactures product around the clock, operating three shifts per day.  This case primarily concerns operations and employment decisions made with respect to employees in the defendant's "cup" department, that portion of the defendant's production facility that produces foam cups.  The cup department is comprised of three separate areas: "North Cup" and "South Cup" are located in the Leola plant, and the third cup production area is located in the Lancaster plant.

## A.  Ibrahim Al-Badawi

Mr. Al-Badawi was born in Sudan, and in 1995, left Sudan for Senegal.  He then emigrated from Senegal to the United States in approximately 1997.  Mr. Al-Badawi was hired by the defendant on June 16, 1997, as an inspector/packer, an entry level position at the company.  He achieved full-time status on August 25, 1997.  As inspector/packer working in the cup department, Mr. Al-Badawi's principal duties were to ensure that

---

[2]  The majority of facts are taken from the defendant's statement of undisputed facts (Document #30-1), and the plaintiff's statement of undisputed facts (Document #40-1).  The remaining facts are cited to the record where necessary.

manufactured products met quality standards and were correctly boxed for shipment.

On July 12, 1998, Mr. Al-Badawi was promoted to the position of mechanic in the cup department.  In that job, his principal duties were to ensure that the cup-producing machines functioned correctly.  He reported to various supervisors during his tenure in that position.  In addition to inspector/packers and mechanics, each shift supervisor in the cup department also supervised an assistant shift supervisor, print operators, maintenance employees, quality control inspectors, recycle employees and material handlers.  The defendant's supervisory structure is that each shift has a supervisor, who is responsible for each shift's safety and productivity.  The duties of a supervisor also include scheduling and assignment of employees, evaluating employees working on each shift, conflict resolution between shift employees, and first-level discipline of employees.

In June 2002, Mr. Al-Badawi became what is referred to as a "lead mechanic," the mechanic considered to be the "go-to" mechanic on the shift, but who receives no additional pay.  The position has more responsibility than a regular mechanic, in that the lead mechanics begin their shifts earlier to set up and end their shifts later to deal with outstanding issues.  For a short period of time in 2003, Mr. Al-Badawi filled in as an Assistant Supervisor in the South Cup area when its supervisor was injured.  At other times, Mr. Al-Badawi filled in for supervisors when they were absent, both on a short-term basis and a long-term basis.  Lead mechanics are not responsible for employee evaluations and never discipline other employees.

Mr. Al Badawi attended Harrisburg Area Community College while working for the defendant, and obtained an Associate's Degree in Engineering in May 2004.

3

### B.  Adrian Bombin

Adrian Bombin emigrated from Cuba to the United States in 2003.  He holds a four-year bachelor's degree in diesel mechanics from Martinez de Chile University in Havana, and had had some supervisory experience before coming to this country.  In Cuba, Mr. Bombin worked at a company for about a year which manufactured plastic eating utensils where he oversaw quality control for the product, ensured that the machines worked properly, and that the operation ran efficiently.  Mr. Bombin also supervised four workers and resolved conflicts among them.  Upon leaving the plastic company, Mr. Bombin entered the Cuban army as a rank-and-file soldier.  During a service period of two years, Mr. Bombin came to be treated by his commanding officer as an informal "leader" of a sub-unit of five or six other soldiers.  Although he did not outrank those men, Mr. Bombin ensured that they performed their jobs.

The defendant hired Mr. Bombin on June 23, 2003 as an inspector/packer on the midnight to eight shift.  After about fifteen months, he became a material handler in South Cup, a non-supervisory position which supplies the production-related work stations with the necessary raw materials to produce the end product, and moves the completed product away from the production area and into the warehouse.  After several months, Mr. Bombin became a mechanic in the cup operation.  During his time as a mechanic, Mr. Bombin filled the lead mechanic role for approximately 1½ to 2 years in 2007-2008.

### C.  Ulises Roman

The EEOC sent a solicitation letter to Ulises Roman, and ultimately identified him

as a claimant.  Mr. Roman, a Hispanic male, was initially hired in 1997 as a maintenance mechanic, and left in 2001 for a position as a non-supervisory maintenance/preventative mechanic for Wilton Armetele, a tableware manufacturer.  After eight months, Mr. Roman switched to a different company to work as a site manager for Investment Real Estate Management, LLC, d/b/a Move-In Self Storage, a company which manages storage facilities.  As a site manager, Mr. Roman was in charge of the leasing and maintenance operations for the facility, and generated reports using Excel and Lotus.  Six months later, Mr. Roman was promoted to Delinquent Tenant Manager, and placed in charge of nine properties in Virginia, Maryland, and Pennsylvania.  He traveled to various locations, reviewing delinquency lists, setting up auctions for the liquidation of delinquent tenants' personal items, performing inventories of delinquent storage units, adjusting prices based on vacancy rates, and training newly-hired site managers in the self-storage business.  The position required him to travel to different sites every day, which resulted in his spending a significant amount of time in his car, driving between locations.  Mr. Roman stayed in that position for approximately one year, working approximately seventy hours a week.  He returned to employment with the defendant in October 2003 as a mechanic.  After he was rehired, Mr. Roman became a lead mechanic at the North Cup area, and worked in the West Side.  He ran that area, collecting numbers, production totals, and reporting them back to the supervisor on the other side of the plant.  He floated between rooms to aid the other mechanics.  Mr. Roman became part of the Mechanic Mentoring Program, training new mechanics and employees to re-take the mechanic's aptitude test which they had previously failed.

## II.  STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(a).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials.  FED.R.CIV.P. 56(c)(1)(A).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. at 322.  Under Rule 56, the court must view the evidence presented on the motion in the light most favorable

to the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  See 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence of discrimination, the McDonnell Douglas burden-shifting framework applies to claims brought under Title VII and the PHRA.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973); Jones v. Sch. Dist., 198 F.3d 403, 410 (3d Cir. 1999) (applying the same framework to both types of claims).

For failure to promote claims, the initial burden is on the employee to show that (1) he is a member of a protected class, (2) he sought and was qualified for the promotion, (3) he was rejected for the promotion, and (4) a non-member of the protected class was treated more favorably."  Young v. Pennsauken Twp. Sch. Dist., 47 F. App'x 160, 161 (3d Cir. 2002) (citing Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir. 1997)).

7

Here, for the purposes of this motion, the defendant concedes that the three employees have established *prima facie* cases.  Accordingly, they are entitled to an inference of discrimination.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-254 (1981).  The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for each employee's rejection, id. at 253, by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).  If the defendant produces a legitimate reason, the burden shifts back to the employee, who must show that the reasons offered by the defendant are mere pretexts for discrimination.  Young, 47 F. App'x at 161 (citing Burdine, 450 U.S. at 252-253; Jones, 198 F.3d at 410).

To show pretext and survive a motion for summary judgment, an employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Fuentes, 32 F.3d at 764.  The Third Circuit has "characterized this final aspect of the McDonnell Douglas analysis as comprised of two alternatives" as articulated by Fuentes and Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996).  See Jones, 198 F.3d at 413 (citing Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)).  A plaintiff is required to "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions" that the employer's proffered

reasons are "unworthy of credence," see Jones, 198 F.3d at 413 (citing Keller, 130 F.3d at 1108); or, in the alternative, "that discrimination was more likely than not a motivating or determinative cause of the adverse employment action," see Jones, 198 F.3d at 413 (citing Fuentes, 32 F.3d at 764).  See also Valdes v. Union City Bd. of Educ., 186 Fed. App'x. 319, 322-323 (3d Cir. 2006) (quoting Fuentes, 32 F.3d at 765).

In other words, because the factfinder could potentially conclude that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, see Hicks, 509 U.S. at 511, a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  Fuentes, 32 F.3d at 764.  Thus, if the plaintiff has pointed to evidence to discredit sufficiently the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case.  Id. Discrediting an employer's proffered reason requires a demonstration of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that a reasonable fact-finder could rationally find them unworthy of credence.  Id. at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

**A.  Mr. Al-Badawi**

1.  Application for Relief Shift Supervisor – October 31, 2003

On October 31, 2003, Mr. Al-Badawi applied for the posted position of Relief

Shift Supervisor, but was not selected.  This application is outside of the 300-day limitations period and is not part of his claim of discrimination here.

## 2.  Application for Relief Shift Supervisor – September 2004

Mr. Al-Badawi claims that he was discriminated against by the defendant when it denied him a promotion in September 2004 to the position of Relief Shift Supervisor for the 4:00 to 12:00 shift working in the South Cup area.  Three employees applied for the position:  Mr. Al-Badawi; Wesley Collins, a white male; and Karastina Ruhl, a white female.  The posted requirements for this position were:  (a) knowledge and ability to function as a cup mechanic, material handler, print operator, inspector packer, and quality assurance; (b) general supervisory experience or skills desirable; (c) ability to communicate (verbally and written) in English; (d) familiarity with computer desirable; (e) passing score on mechanical aptitude test; (f) familiarity with hand tools desirable; and (g) must be able to lift fifty to sixty-five pounds.  See Pls.' Exh. 6.

Prior to the position being posted, Karastina Ruhl was approached by Kerry Noggle, the defendant's Operations Manager, and was asked if she would be interested in applying for the position.[3]  At the time of the job posting, Mr. Al-Badawi and Miss Ruhl were both working in the cup department on the evening shift.  Miss Ruhl worked there

---

[3]  I note that Mr. Noggle approached Miss Ruhl for the position because her previous supervisory position with the defendant had been eliminated as discussed below, and because she was continuing to be paid at a supervisor's pay rate.  See Veser Dep. at 113-114.  Mr. Noggle testified that Clarence Wenger, the defendant's Plant Manager, suggested that Miss Ruhl be included in the interview process because of her previous supervisory experience and because the defendant, through its affirmative action plan, was actively looking to fill positions that were under-represented by minorities or females.  See Noggle Dep. at 99; see also Wenger Dep. at 71-72.

as a Print Operator.  Miss Ruhl had actual supervisory experience with the defendant in the Injection Molding Department where she worked as a Shift Supervisor from August 3, 2003 to July 4, 2004.  The position of Shift Supervisor is a higher-level position than the Relief Shift Supervisor position for which she was applying in September 2004.  Miss Ruhl was well-regarded by Jim Bouman, the defendant's Production Manager and Miss Ruhl's immediate supervisor.

While working as a Shift Supervisor, Miss Ruhl attended a training program entitled, "Foundations for Leadership" in June 2004.  The program's trainer noted that Miss Ruhl stood out "above the crowd" which included other Dart managers ranging in experience from "a few months to 30 plus years."  The trainer noted that Miss Ruhl's involvement in the program helped to make it "an even more positive experience for all."

On July 4, 2004, the defendant changed the Injection Molding operation from a twenty-four hour/seven-day a week operation to a five-day a week operation. Accordingly, the number of Shift Supervisors in that department was decreased from five to three.  Miss Ruhl was one of the supervisors affected, and she was transferred to the cup department as a Print Operator but continued to be paid her supervisor's rate of pay.

Mr. Noggle was the decisionmaker for the Relief Shift Supervisor position in September 2004.  He interviewed Mr. Al-Badawi and Miss Ruhl.  Mr. Noggle testified that when promoting an employee to a supervisory position, he considers: "supervisor experience, leadership, proven leadership skills, ability to communicate, working well with others are some very important things in the supervisory role."  See Noggle Dep. at 91.  Mr. Noggle selected Miss Ruhl for the position based upon her prior role as Shift

Supervisor in the Injection Molding Department, a job she held for approximately eleven months.  Id. at 93.  Mr. Noggle also noted that Miss Ruhl had a very good recommendation from Mr. Bouman, her direct supervisor, on her ability to supervise her crew.[4]  Id.

In contrast, Mr. Al-Badawi had never served as a full-time employee in any supervisory role with the defendant.  When informed by the defendant's managers that Miss Ruhl was the successful applicant, Mr. Al-Badawi responded that he was better qualified than Miss Ruhl for the position.  He insists that the defendant should have weighed his mechanic experience as more valuable than Miss Ruhl's supervisory experience.  At his deposition, Mr. Al-Badawi agreed that Miss Ruhl's supervisory experience was better than his own.  See Al-Badawi Dep. at 193.  Mr. Al-Badawi testified, however, why he believes that discrimination motivated the decision to deny him the promotion:

> Q:    Okay.  Do you believe that your national origin played
>       a role in that decision?
>
> A.    Exactly.
>
> Q:    And why do you believe that?
>
> A:    Because I applied several times.  I was not given position.
>
>                              ***
>
> Q:    Okay.  I am talking about this job.  So why do you believe
>       that your race played a role in this particular job?

---

[4]  In fact, Mr. Bouman indicated on Miss Ruhl's 2003 evaluation that:  "Kara moved into Shift Supervisor just several weeks ago.  She is energetic, fair, and wants to do the job correctly. She takes challenges and difficult employee issues in stride.  Time will tell, but I am confident Kara will be an asset to the Supervisor Group."  See Def.'s Exh. LL.

A:    Because, as previously, I was not given despite my better
      position in taking that position.

Q:    So the fact that you didn't get the job is the reason
      you believe you were discriminated against?

A:    Not just because I didn't get the job . . . because of my --
      well, my experience speaks for itself.  If I don't get it,
      then what would that be?

See Al-Badawi Dep. at 194-195.

Given the evidence of Miss Ruhl's performance in her prior role as Supervisor, her

success in the corporate training program, the circumstances surrounding the elimination

of her previous supervisory position, the fact that she was continued to be paid at her

supervisor's pay rate, and Mr. Al-Badawi's lack of supervisory experience, the defendant

has satisfied its burden to produce a legitimate, non-discriminatory reason for the

selection of Miss Ruhl over Mr. Al-Badawi for the position of Relief Shift Supervisor in

September 2004.

Accordingly, the burden shifts to the Commissioner and to Mr. Al-Badawi to

provide evidence that the defendant's legitimate explanation was not just wrong, but was

so plainly wrong that it could not have been the defendant's real reason.  Parks v.

Rumsfeld, 119 Fed. App'x. 382, 384 (3d Cir. 2005) (citing Keller v. Orix Credit Alliance,

Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)).  The question is not whether the defendant

made the best, or even a sound, business decision.  It is whether the real reason is

discrimination.  Id.  Or, in the alternative, Mr. Al-Badawi must point to evidence that

proves discrimination in the same way that critical facts are generally proved, i.e., "based

solely on the natural probative force of the evidence." Id.

In an attempt to satisfy this burden, the plaintiffs argue that the defendant knowingly promoted Miss Ruhl, a problematic employee whose problems persisted after her promotion. This action, they insist, suggests a lack of credibility on the part of the defendant, and contributes to a finding of pretext sufficient to defeat summary judgment. I do not agree.

The plaintiffs challenge Miss Ruhl's qualifications, her "unremarkable" pre-Dart work history, her lackluster experience at Dart, and her subsequent poor performance after the September 2004 promotion. First, the plaintiffs are correct that Miss Ruhl's education is not as significant as that of Mr. Al-Badawi. Miss Ruhl received her GED in 1996, a year before she began her employment at Dart. Mr. Al-Badawi went to college in the evening while working at Dart and attained an Associate's Degree. While the accomplishment of a degree is commendable, a certain educational level was not specifically required for the Relief Shift Supervisor position.

Second, Miss Ruhl's pre-Dart work history is, as characterized by the plaintiffs, unremarkable. Before beginning her employment at Dart, Miss Ruhl worked at a convenience store where she requested a demotion from an assistant manager position. In less than three years, she worked at five employers, spending less than a year at each employer. The decision to hire Miss Ruhl in 1997, however, is not at issue here. Accordingly, evidence of her pre-Dart work history, however spotty, is irrelevant in determining whether the defendant's decision to promote Miss Ruhl over Mr. Al-Badawi in September 2004 was discriminatory.

14

Third, the plaintiffs contend that Miss Ruhl's work history at Dart before the September 2004 promotion included various deficiencies which should have rendered the likelihood of her being promoted doubtful.  For example, although Miss Ruhl had received several "write-ups" over the years for attendance problems, the defendant nevertheless promoted her in 2003 to Shift Supervisor in its Injection Molding Operation, but had to demote her after eleven months.  Again, I note that the defendant's decision to promote Miss Ruhl in 2003 is not at issue here.[5]  I also note, however, that it is unfair for the plaintiffs to suggest that Miss Ruhl's demotion to the cup department was somehow related to her performance.  As discussed above, Miss Ruhl's position was eliminated when the defendant changed its operation from seven days a week to five days a week.  In a sworn declaration, Mr. Bouman indicated that he was the decisionmaker who promoted Miss Ruhl in 2003, and that her subsequent transfer to the cup department had

> "nothing to do with her performance as a Shift Supervisor.  In fact, it was my assessment as her supervisor that she did a good job as a Shift Supervisor, and I informed Kerry Noggle of that opinion when he asked me."

See Bouman Declaration ¶¶ 4, 6, 8.  Thus, the only evidence of record that addresses

---

[5]  I am also not persuaded by the plaintiffs' argument that the defendant's alleged preference for supervisory experience and thus its stated nondiscriminatory reason for the September 2004 decision are weakened because, as in Miss Ruhl's case in 2003, certain employees have been promoted to supervisory positions over the years without any prior supervisory experience.  In fact, Mr. Al-Badawi was promoted to his first supervisory position in November 2005 with no previous experience other than filling-in for other full-time supervisors.  The defendant has not attempted, however, to establish that it adheres to a rigid policy of never promoting an employee without previous supervisory experience.  Indeed, the fact that every supervisor must have at some point been given his or her first opportunity for a supervisory position without having had previous supervisory experience has no impact on an employer's preferring that previous experience as a qualification.

Miss Ruhl's previous performance as a Shift Supervisor was Mr. Noggle's testimony that Mr. Bouman had provided Mr. Noggle with a "very good recommendation . . . on her ability to supervise her crew" in that position.  See Noggle Dep. at 93-94, 95.  Mr. Bouman supported this allegation in his declaration.  See Def.'s Exh. KK.  This evidence establishes that Miss Ruhl was a valued employee who was well-regarded by her direct supervisor during her tenure as Shift Supervisor, and nothing in her work history shows otherwise.

Fourth, in a further effort to discredit Miss Ruhl's selection for the Relief Shift Supervisor job, the plaintiffs specifically point to a post-promotion performance evaluation of Miss Ruhl prepared by Mr. Noggle dated October 1, 2004, just a couple of weeks after her promotion.[6]  See Pls.' Exh. 10.  The evaluation form consists of twenty-nine categories in which an employee is rated.  There are five ratings for each category, i.e., poor, fair, good, superior, and excellent.  The plaintiffs note that, out of the twenty-nine categories, Mr. Noggle rated Miss Ruhl as only "fair" in four categories, and as "good" in all remaining categories.  That she was not rated higher in these categories after less than a month on the job is somehow evidence of pretext according to the plaintiffs.  The plaintiffs place further emphasis on Mr. Noggle's comments on the evaluation form:

> Being new to the cup room, you have much to learn.
> Learn the basics and build on top of them.  Ask questions

---

[6] Mr. Noggle specifically referenced this at his deposition when he testified:  "I would say, if I could add this, this appraisal is done – she probably wasn't on the job more than 30 days, if that.  Couldn't even have been that much time."  See Noggle Dep. at 97.

and ask for help when needed.  Take full advantage of the
supervisor training that Dart supplies to help you better
supervise.  **Learn from mistakes**, don't be discouraged
by them.

Id. at 2. (emphasis added).  The plaintiffs argue that because the comments suggest that

Miss Ruhl may have made mistakes in her weeks-old position, it follows that the

defendant should not have promoted her over Mr. Al-Badawi.  Moreover, they argue that

Miss Ruhl continued to experience problems in this position, was demoted in November

2005, a little over a year after the promotion, and was eventually terminated.  For the

following reasons, none of these allegations can create a fact issue as to pretext.

Initially, I note that any evidence of Miss Ruhl's post-promotion performance is

irrelevant because the legality of the defendant's decision to not promote the plaintiff

must be judged by the facts existing at the time of that decision.  See Bruno v. W.B.

Saunders Co., 882 F.2d 760, 768 n.4 (3d Cir. 1989) (concluding that there was no

reversible error in the district court's decision to exclude evidence of post-selection

performance on the ground that it is irrelevant).  It is only the facts existing at the time of

the defendant's decision and leading up to that decision which are relevant to the question

of whether the defendant unlawfully discriminated against Mr. Al-Badawi when it made

its decision.  Indeed, this inquiry is limited to the knowledge of the employer at the time

it made the decision.  That Miss Ruhl may have had difficulty in the position subsequent

to her promotion provides no insight into the decision process of the defendant, or

specifically whether it unlawfully discriminated against Mr. Al-Badawi when it made that

decision.  Accordingly, the proposed evidence of performance difficulties, subsequent

termination, and a less than stellar evaluation cannot be considered here in determining whether the defendant's legitimate, nondiscriminatory reason for not promoting Mr. Al-Badawi is pretext.

Finally, the plaintiffs argue that Miss Ruhl's mechanic experience pales in comparison to that of Mr. Al-Badawi.  At the time of the job posting in September 2004, Mr. Al-Badawi had six years of relevant experience in the cup department and was highly knowledgeable about its mechanical operations.  In his 2003 and 2004 performance appraisals, he received the highest ratings for his technical knowledge and skills, for his accuracy and efficiency, and for his production and output.  Both evaluations indicated "great work performance," including "great attendance."  It is enough, the plaintiffs insist, that Mr. Al-Badawi functioned as a lead mechanic and as an acting Assistant Supervisor to establish that he possessed sufficient supervisory experience to be viewed as the better candidate over Miss Ruhl.  Mr. Al-Badawi insists that his technical knowledge of the cup department should have outweighed Miss Ruhl's supervisory experience.

The Third Circuit has specifically directed that courts not engage in this type of review.  Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3d Cir. 1995) (courts do not sit as a super-personnel department that re-examines an entity's business decisions); see also Ezold, 983 F.2d at 528 ("when an employer produces evidence that the plaintiff was not promoted because of its view that the plaintiff lacked a particular qualification the employer deemed essential to the position sought, a district court should focus on the qualification the employer found lacking in determining whether non-

18

members of the protected class were treated more favorably"); <u>Simpson v. Kay Jewelers,</u> <u>Div. of Sterling, Inc.</u>, 142 F.3d 639, 647 (3d Cir. 1998) (the plaintiff must point to evidence from which a fact-finder could reasonably infer that the plaintiff satisfied the particular criterion or qualifications identified by the employer or that the employer did not actually rely upon those criteria or qualifications).  In asking the court to review the defendant's weighing of the candidates' qualifications, the plaintiffs ignore the well-settled maxim that district courts do not sit as super-personnel departments and will not second-guess an employer in a mere dispute over qualifications.  <u>Ezold</u>, 983 F.2d at 523 ("more than a denial of promotion as a result of a dispute over qualifications' must be shown to prove pretext"); <u>see also</u> <u>Brewer</u>, 72 F.3d at 331.  The question is not what the plaintiffs think should be considered the most important qualification, but what the employer thinks is the most important qualification.  Here, the defendant chose to place more value on Miss Ruhl's previous supervisory experience over the mechanic experience of Mr. Al-Badawi.  A determination of the soundness of that business decision is inappropriate here.

Accordingly, I find that the plaintiffs have failed to satisfy their burden to show that the reasons offered by the defendant for promoting Miss Ruhl over Mr. Al-Badawi are mere pretexts for discrimination.

3.  <u>Application for Shift Supervisor – May 2005</u>

Mr. Al-Badawi next argues that the defendant discriminated against him when it

denied him the promotion to Shift Supervisor[7] in May 2005.  Instead, the defendant

selected Curt Rager, a Caucasian male, for the position.  See Noggle Dep. at 108.  Mr.

Rager graduated from high school in 1998, and shortly thereafter began to work for the

defendant as an extrusion helper with "reclaim equipment."  See Rager Dep. at 10.  In

2001, Mr. Rager was promoted to Extrusion Shift Supervisor.

When notified by his managers of their decision to select Mr. Rager in May 2005,

Mr. Al-Badawi again insisted that he was the better person for the position based on his

education.[8]  See Noggle Dep. at 110.  At his deposition, Mr. Al-Badawi stated that he

believed he was denied this promotion because of his national origin, "because despite

the training you're talking about, despite how many times I apply for, they – they never

gave me any position and so . . ."  See Al-Badawi Dep. at 222.  Mr. Al-Badawi also

claims that he must have been discriminated against because "well, there's no person of

---

[7]  The posted requirements for this position were: (a) knowledge and ability to function as a cup
mechanic, material handler, print operator, inspector packer and quality assurance; (b) generally
supervisory experience or skills desirable; (c) ability to communicate (verbally and written) in
English; (d) familiarity with computer desirable; (e) passing score on mechanical aptitude test;
(f) familiarity with hand tools desirable; (g) must be able to lift 50 to 65 lbs.  See Pls.' Exh. 17.

[8]  Shortly after the denial of this promotion, in order to enhance Mr. Al-Badawi's prospects for
future supervisory opportunities, the defendant offered him the opportunity to attend manager-
training sessions that were attended almost exclusively by then-current Managers and
Supervisors in November 2004.  Thereafter, while still a mechanic, Mr. Al-Badawi attended
several manager-training sessions, one of only three non-supervisors to be given this opportunity.
While Mr. Al-Badawi initially claimed in his deposition that this opportunity had been prompted
by his attorney's letter to the company complaining of discrimination, he later recognized that
his attorney's letter was not received until approximately six months after the defendant, on its
own, offered Mr. Al-Badawi this rare opportunity.  See Al-Badawi Dep. at 197-204.  The goal of
this initiative was to prepare Mr. Al-Badawi for a future supervisory role with the defendant.
Mr. Al-Badawi was promoted to the position of Relief Shift Supervisor in November 2005 and
was subsequently promoted to the position of Shift Supervisor in January 2008.  He continues to
be employed in the latter position.

minority in the position, whatever position." Id. at 223.

In satisfying the defendant's burden to produce a legitimate nondiscriminatory reason for the selection of Mr. Rager, Mr. Noggle testified that he selected Mr. Rager from the pool of candidates because Mr. Rager had the highest qualifications.  See Noggle Dep. at 108.  In fact, at the time Mr. Rager was selected for the Shift Supervisor position, he had "five years of supervisory experience at Dart Container."  Id. at 109.  He first became the Extrusion Department Supervisor in 2001.  See Rager Dep. at 28.  In contrast, Mr. Al-Badawi had never functioned as a Supervisor on a permanent basis for the defendant or any other employer.

I am again not persuaded by the plaintiffs' attempt at satisfying their burden of showing pretext.  The plaintiffs challenge Mr. Rager's qualifications and experience, arguing that they were inferior to those of Mr. Al-Badawi, and claiming that the defendant erred when it preferred Mr. Rager's supervisory experience over Mr. Al-Badawi's mechanic experience.  They complain that Mr. Rager's actual supervisory experience was limited to the extrusion operation, an area completely different from the cup department, while Mr. Al-Badawi was familiar with the cup department and from time to time was assigned some supervisory duties there.  This argument is nothing more than a disagreement over qualifications which, as discussed above, cannot establish pretext.  In choosing its supervisors, the defendant is free to prefer previous supervisory experience over technical or department experience.  The issue here is whether the defendant acted with discriminatory intent, not whether it was correct or mistaken in its weighing of the candidates' qualifications.  See Ezold, 983 F.2d at 523  Accordingly, the

21

court is not entitled to substitute its own judgment concerning whether the defendant's decision was wise, or fair, or mistaken.  A decision is not unlawful merely because an individual may disagree with the reasons stated by the decisionmaker or because a person may believe the decision was wrong or even unreasonable or mistaken.  See Fuentes, 32 F.3d at 765.  While Mr. Al-Badawi may wish that the defendant gave his mechanic experience greater weight, it did not and it was not required to do so.  It is not for the court to now independently apply the selection criteria preferred by Mr. Al-Badawi.

The plaintiffs have again failed to sustain their burden to establish that the defendant's articulated reasons for its employment decision to promote Mr. Rager over Mr. Al-Badawi were a pretext for unlawful discrimination.  See Jones, 198 F.3d at 410; Fuentes, 32 F.3d at 763.  There has been no showing that the "defendant's proffered reason 'was so plainly wrong that it cannot have been the employer's real reason.'" Keller, 130 F.3d at 1109).

**B.  Mr. Bombin**

1.  Application for Assistant Supervisor – October 2007

The EEOC has brought a claim of employment discrimination on behalf of Mr. Bombin against the defendant.  In October 2007, Mr. Bombin applied for an Assistant Supervisor position on the 8:00 to 4:00 shift in the defendant's South Cup room.  Mr. Bombin testified that he does not know whether he believes he did not receive this position because of his national origin.  Mr. Bombin believes that Mark Lipko, another employee, was awarded the position instead.  Mr. Bombin also does not know who made the hiring decision, why Mr. Lipko was given the job, or how long Mr. Lipko had worked

for the defendant before the promotion.  Mr. Bombin believes that Mr. Lipko had previously been an Assistant Supervisor on the 12:00 to 8:00 shift.  Mr. Bombin is not aware of any facts which would indicate to him that he did not receive the Assistant Supervisor South Cup 8:00 to 4:00 job because of his national origin.

The relevant evidence shows that the decisionmakers with respect to the Assistant Supervisor South Cup 8:00 to 4:00 position were Ron Benedict and Leon Himmelberger, the Production Managers for Dart's cup operation.  At the time of the job's posting, Mark Lipko, the successful candidate for this position, had been the Assistant Supervisor on a different shift in South Cup for approximately three years.  Mr. Bombin, in contrast, did not yet have any full-time supervisory experience while working for the defendant.

Mr. Benedict and Mr. Himmelberger jointly made the decision to choose Mr. Lipko over Mr. Bombin because they determined that Mr. Lipko was the best qualified applicant due to his superior supervisory experience.  Moreover, his transfer to the 8:00 to 4:00 shift in South Cup was a lateral shift change rather than a promotion.  Such lateral shift changes are easier to accomplish at Dart than a promotion.  In their declarations, Mr. Himmelberger and Mr. Benedict both indicated, "Since I have been a decisionmaker for promotions, successful managers/supervisors seeking a lateral shift change are favored over employees seeking to be promoted, generally based upon their superior supervisory experience."  See Himmelberger Declaration at ¶ 8; see also Benedict Declaration at ¶ 8. Eric Horn, a Human Resources Manager for the defendant, also indicated that it was his experience at Dart that a "successful Supervisor or Assistant Supervisor seeking a lateral transfer is generally favored over a lower-level employee seeking a promotion to a

Supervisor or Assistant Supervisor position." <u>See</u> Horn Declaration at ¶ 45.

The uncontradicted record indicates that the defendant's employment decision regarding Mr. Lipko was simply a lateral transfer, and not a promotion. Mr. Lipko had been a successful Assistant Supervisor on the 12:00 to 8:00 shift in the South Cup area for three years when the same position became available on the 8:00 to 4:00 shift. The decisionmakers testified that Mr. Lipko was the best candidate for the position based on his supervisory experience in the South Cup room, experience which was superior to that of Mr. Al-Badawi.

The plaintiffs attempt to prove pretext by attacking Mr. Lipko's work history with the defendant. They claim that the defendant's proffered reason for selecting Mr. Lipko for the promotion cannot be believed because Mr. Lipko had on-going chronic and repeated attendance problems which persisted throughout the time of this promotion. First, there is no evidence that the decisionmakers considered any candidate's attendance in making this selection. The record reflects, however, that the defendant's Human Resources Department initially reviews a candidate's attendance at the pre-screening stage. If attendance disqualifies an applicant, the disqualification occurs at that initial level and the applicant never proceeds to the interview stage of the process. <u>See</u> Noggle Dep. at 46-48.

Second, although Mr. Lipko had received prior attendance warnings, attendance points at the defendant expire at the rate of one point per twenty-eight days. <u>See</u> Veser Dep. at 94. There is no evidence in the record of the number of attendance points that would disqualify an applicant from consideration, and no evidence of the number of

24

attendance points Mr. Lipko had at the time of this promotion.

There is no question that Mr. Lipko possessed greater supervisory experience in the South Cup area than Mr. Bombin.  Moreover, the uncontradicted evidence in the record is that lateral transfers are done essentially as a matter of course at the defendant and take precedence over promotions.  Accordingly, the plaintiffs have presented no evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" to render the foregoing legitimate reasons for Dart's employment decision to promote Mr. Lipko over Mr. Bombin "unworthy of credence."  See Fuentes, 32 F.3d at 765.

### 2.  Application for Shift Supervisor – January 2008

The EEOC has brought a second claim of employment discrimination against the defendant on behalf of Mr. Bombin.  In January 2008, Mr. Bombin applied for a Shift Supervisor position on the 8:00 to 4:00 shift in the defendant's Lancaster plant.  Although Mr. Bombin understood that one should typically have Assistant Supervisor experience before becoming a Shift Supervisor at Dart, he nevertheless applied.  The position was awarded to Jerry Border, a Caucasian employee with about twenty-five years of service and three years of supervisory experience with the defendant.  At the time of his promotion, Mr. Border was the Assistant Supervisor on that same shift.  The evidence shows that Bruce Paul, the Production Manager for Dart's Lancaster facility, was the decisionmaker who chose to promote Mr. Border over Mr. Bombin.  In satisfying the defendant's light burden of offering a legitimate nondiscriminatory reason for that decision, Mr. Paul testified that Mr. Border was the best qualified applicant for the job

25

because of his previous supervisory experience, and because Mr. Border had experience in the Lancaster facility, whereas Mr. Bombin did not.

The plaintiffs attempt to show pretext by attacking Mr. Border's work history with the defendant, none of which is relevant here. Mr. Border was hired by the defendant in 1983, and was promoted to Shift Supervisor in 1988. In July 1990, he was demoted to Relief Supervisor. In November 1991, Mr. Border was again demoted to cup mechanic. Twelve years later, in November 2003, Mr. Border was promoted to Assistant Shift Supervisor on the 8:00 to 4:00 shift in Lancaster. At that time, Mr. Border's last non-attendance-related discipline was for an April 1998 incident in which he purchased Dart product for a non-employee. The uncontroverted evidence shows that Mr. Border worked well as the Assistant Supervisor on the 8:00 to 4:00 shift from November 2003 until he was promoted to the Shift Supervisor position on that same shift in January 2008. The plaintiffs have not cited any infractions in Mr. Border's work history between his November 2003 promotion to Assistant Supervisor and his January 2008 promotion to Shift Supervisor, and there is no evidence of any deficiencies in Mr. Border's performance during those years. Mr. Border's prior demotions occurred in 1990 and 1991, twelve years before his 2003 promotion, a promotion which is not at issue here. Additionally, his last non-attendance-related discipline occurred more than five years before his 2003 promotion. The plaintiffs' attempt to portray Mr. Border as a poor-performing employee at the time of his 2003 and 2008 promotions is not supported by any record evidence.

Moreover, there was a total of nineteen interviewees for this position. As the

26

defendant points out, Mr. Border was not promoted to Shift Supervisor "instead of Mr. Bombin," he was promoted to Shift Supervisor instead of eighteen other qualified applicants.

Finally, in another attempt to prove pretext, the plaintiffs also point out that Mr. Border was subsequently demoted in January 2009.  As shown above, work history subsequent to a promotion is irrelevant to a pretext analysis because the legality of the defendant's decision to promote Mr. Border over Mr. Bombin must be judged by the facts existing at the time of that decision.  See Bruno, 882 F.2d at 768.  It is only the facts existing at the time of the defendant's decision and leading up to that decision which are relevant to the question of whether the defendant unlawfully discriminated against Mr. Bombin when it made its decision.  Accordingly, the proposed evidence of performance difficulties or subsequent demotion cannot be considered here in determining whether the defendant's legitimate, nondiscriminatory reason for not promoting Mr. Bombin is pretext.

I again must note that the wisdom of the defendant's employment decision is not the appropriate inquiry here.  "To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765. There is no evidence that either the defendant did not genuinely believe that Mr. Border's supervisory experience made him the better qualified candidate, or that the decision was "so plainly wrong that it cannot have been the employer's real reason." Keller, 130 F.3d

at 1109.

### 3. Application for Assistant Supervisor – March 2008

Initially, the EEOC had brought a third claim of employment discrimination on behalf of Mr. Bombin against the defendant.  Mr. Bombin applied for a promotion to Assistant Supervisor on the 8:00 to 4:00 shift at Dart's Lancaster plant in March 2008. Mr. Bombin was denied this promotion when Tim Lipko, the Assistant Supervisor on the 12:00 to 8:00 shift in Lancaster, was laterally transferred to the 8:00 to 4:00 shift, effective May 18, 2008.  Mr. Bombin had also applied for a promotion to Assistant Supervisor on the 4:00 to12:00 shift at Dart's Lancaster plant in February 2008.  Mr. Bombin was awarded this promotion effective April 20, 2008.  In their response to the defendant's statement of undisputed facts, the plaintiffs indicated that because of this promotion, the EEOC was no longer pursuing the claim on behalf of Mr. Bombin regarding the defendant's denial of a promotion to Assistant Supervisor on the 8:00 to 4:00 shift at the defendant's Lancaster plant.  See Document #40-1 at 20.

## C.  Mr. Roman

### 1. Application for Assistant Supervisor – May 2006

The EEOC brought this claim on behalf of Mr. Roman challenging the defendant's decision to promote Alex Carlov over Mr. Roman to the position of Assistant Supervisor on the 12:00 to 8:00 shift in the defendant's North Cup area in May 2006.  Mr. Carlov testified that he had previously been a supervisor at a furniture store in his native Moldova.  Mr. Roman testified that he had previously been a rental property manager, but had no significant supervisory responsibilities.

28

Mr. Benedict and Mr. Himmelberger were also the decisionmakers for this decision.  In satisfying the defendant's burden to show a legitimate nondiscriminatory reason for its decision, Mr. Benedict testified that the decisionmakers selected Mr. Carlov because he

> "by far was a superior interview.  And also Alex through my experience at Dart was a star, if you know what I mean as far as out in the plant.  A very – a real go-getter, willing to work in all areas and do whatever.  He was a star for lack of a better term."

See Benedict Dep. at 48.  In his Declaration, Mr. Himmelberger indicated,

> "While I did not, without being shown the relevant documentation, recall this promotional decision during my deposition, I have since reviewed the deposition and recall that I and Mr. Benedict were the decisionmakers with respect to this position and that we decided to promote Alex Carlov to the 12:00 to 8:00 "North Cup" Assistance Supervisor position.

See Himmelberger Declaration at ¶ 13.  He further indicated that he had known

> "Mr. Carlov at the time and knew him to be an outstanding employee with a real "go-getter" personality and approach to his work.  Mr. Benedict and I based our joint decision on our personal knowledge of Mr. Carlov's prior work performance.  Given his prior performance, we both felt he was the best candidate for the job."

Id. at ¶ 14.  In contrast, when asked his opinion of Mr. Roman's performance as a mechanic, Mr. Benedict stated, "I don't recall a great deal.  He was slow, in my opinion."

See Benedict Dep. at 43.  Later in the deposition, Mr. Benedict clarified his description of Mr. Roman's performance:

> "Well, when I say someone is slow, it's typically at best average, but usually below average performance in a

29

> particular job.  Slow in that particular case meant I felt he
> didn't get around the area fast enough, the efficiency
> numbers when he was in a certain area were average at
> best, typically below average.
>
> As far as skills, in my experience and my opinion, he was
> average at best in everything that we would look for."

Id. at 73-74.  Mr. Roman testified that when Mr. Benedict informed him that Mr. Carlov

had been promoted, Mr. Benedict indicated it was because Mr. Carlov had a college

degree and Mr. Roman did not.  Mr. Benedict denies having made that statement.  See

Benedict Dep. at 48.

The plaintiffs attempt to show pretext by suggesting that the defendant's

proffered reason "is subjective to the point that it places the Commission in the

untenable position of rebutting, in effect, a non-reason."  Even drawing all inferences

in their favor, I find that the plaintiffs have failed to meet their heavy burden of

establishing pretext.  Kautz v. Met-Pro, Inc., 412 F.3d 463, 467 (3d Cir. 2005).

The defendant's proffered reasons for its decision to promote Mr. Carlov

include that Mr. Carlov interviewed extremely well for the position, and that the

decisionmakers knew Mr. Carlov personally and found him to be a "go-getter" and an

outstanding employee.  In contrast, Mr. Benedict had a lower opinion of Mr. Roman's

performance, found him to be a slow mechanic which led to poor efficiency numbers,

and felt that Mr. Roman was "average at best" in the areas that the defendant would

typically look for in its supervisory candidates.  Given these legitimate

nondiscriminatory reasons for its decision to promote Mr. Carlov over Mr. Roman, it

was incumbent upon the plaintiffs to offer evidence in the record sufficient to render

the defendant's reasons unworthy of credence.  They have produced no such evidence.

Instead, the plaintiffs rely on other marginal allegations in their attempt to show

pretext.  For example, the plaintiffs argue that the defendant's alleged need for a

candidate with a college degree must be pretext because a degree had never been a

requirement for this position before Mr. Carlov's promotion.  They also find it curious

that Mr. Himmelberger had no memory of Mr. Roman's application for this position at

his deposition, yet his memory revived for the filing of his supportive declaration

attached to the defendant's motion.  Finally, the plaintiffs contend that the defendant's

reasons must be pretext because the decisionmakers' opinion of Mr. Roman's

performance is at odds with a favorable evaluation Mr. Roman received in late August

2006.

 First, I note that the plaintiffs attempt to avoid their heavy burden of establishing

pretext by claiming that the defendant's legitimate, nondiscriminatory reasons for its

decision are too subjective to be valid.  Courts routinely recognize, however, that

employers may rely upon subjective criteria that relate to an employee's performance

in the employers' hiring decisions.  Kautz v. Met-Pro, Inc., 412 F.3d at 468; see also

Haley v. City of Plainfield, 169 Fed. Appx. 670, 673 (3d Cir. 2006) (the

decisionmaker's personal work experience with the plaintiff and selected candidate was

among legitimate reasons for decision).  Here, the defendant legitimately relied upon

its decisionmaker's personal work experience with the candidates and their

performance in determining that Mr. Carlov was better suited for the position than Mr.

Roman.

Second, the plaintiffs' remaining allegations do nothing to establish such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that the defendant's reasons are rendered "unworthy of credence."  The uncontroverted evidence is that Mr. Carlov possessed the equivalent of a bachelor's degree, which he earned in his native Moldova, and he was enrolled in courses toward a second bachelor's degree in institutional technology at Millersville University.  Mr. Roman did not have a college degree.  Whether Mr. Benedict considered the applicants' education has no effect on the defendant's proffered legitimate nondiscriminatory reasons for its decision to promote Mr. Carlov over Mr. Roman.

In addition, that Mr. Himmelberger, one of the two joint decisionmakers, could not recall the specifics of the employment decision at his deposition also fails to establish pretext.  It is uncontroverted that Mr. Benedict, the other decisionmaker, did in fact recall the decision at his deposition, and testified that (1) Mr. Carlov interviewed extremely well for the position; (2) that he personally was acquainted with Mr. Carlov's performance and found him to be an outstanding employee; (3) that Mr. Roman was a slow mechanic which resulted in inefficient numbers; and (4) that Mr. Roman was "average at best" in everything the defendant would look for in a candidate for a supervisory position.  Mr. Benedict's testimony is sufficient to satisfy the defendant's relatively light burden of producing a legitimate nondiscriminatory reason for its decision, and the plaintiffs' attempt at casting doubt on Mr. Himmelberger's memory is inadequate to show pretext.

Finally, the plaintiffs attempt to prove pretext by comparing Mr. Benedict's

opinion of Mr. Roman's performance with a favorable performance evaluation completed

by Michael Kennedy, Mr. Roman's supervisor in late August 2006.  In every category on

the evaluation form, Mr. Roman scored either Superior or Excellent.  Mr. Kennedy added

the notation, "[Mr. Roman] does an excellent job."  While these opinions may be

divergent, the key difference is that Mr. Kennedy was not a decisionmaker for this

promotion.  Mr. Kennedy's evaluation covered Mr. Roman's performance as a mechanic,

and Mr. Benedict's opinion stemmed from an evaluation of Mr. Roman as a potential

supervisor.  Accordingly, this attempt at showing pretext also fails.  The fact remains that

the defendant assessed Mr. Carlov to be the stronger candidate for the position, and the

plaintiffs have failed to establish such "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" to render that evaluation "unworthy of credence."

2.  Application for Assistant Supervisor – November 2007

The EEOC also challenges, on behalf of Mr. Roman, the defendant's decision to

promote Scott Dietz to Assistant Supervisor on the 12:00 to 8:00 shift in the defendant's

North Cup area in November 2007.  That position became vacant when Mr. Carlov, the

North Cup Assistant Supervisor on the night shift, transferred laterally to the position of

South Cup Assistant Supervisor on the same shift.  Mr. Roman was interested in and

applied for the vacant position.  At the time, he was the Lead Mechanic on that shift.

In their declarations, Mr. Benedict and Mr. Himmelberger indicated that they had

jointly made the decision to choose Mr. Dietz for this position because he was the best

applicant based on his many years of experience as a shift supervisor at two prior

employers during which time he routinely supervised between thirty and eighty

33

employees on a given shift.  See Benedict Declaration ¶ 11; see also Himmelberger

Declaration ¶ 11.  They both agreed that the experience Mr. Dietz discussed with them

during his interview rendered him the best candidate for the position.  Id.  At his

deposition, Mr. Himmelberger confirmed that they selected Mr. Dietz for the position

because he had had quite a few years of previous supervisory experience outside of Dart.

See Himmelberger Dep. at 35.

The plaintiffs attempt to prove pretext by citing discrepancies between the

experience listed on Mr. Dietz's employment application and the experience he described

in his interview with Mr. Benedict and Mr. Himmelberger.  On his application for

employment with the defendant, Mr. Dietz listed two previous employers.[9]  See

Document 40-13 at 11.  He listed the job duties he performed as including:  (1)

fabricating and assembling military trailers at the first company; and (2) maintaining and

repairing all production equipment at the second company.  Id.  There is no mention on

the application that Mr. Dietz had ever functioned in a supervisory capacity while with

these previous employers.  The uncontroverted evidence, however, is that the

decisionmakers selected Mr. Dietz for the promotion based on his interview with them at

which Mr. Dietz discussed his supervisory experience at his previous employers.  Even if

that supervisory experience were fabricated, it would have no effect on the defendant's

legitimate, nondiscriminatory reason for its decision unless the defendant was aware of

---

[9] Because it is not dispositive here, I make no determination on the defendant's argument that this application is hearsay and cannot be considered on a motion for summary judgment.  I have considered the application for background purposes and not as proof of the truth of the matter stated by the plaintiffs, i.e., that Mr. Dietz had no previous supervisory experience.

the fabrication.  There is no evidence, however, that Mr. Himmelberger and/or Mr. Benedict reviewed Mr. Dietz's application at the time of their promotion decision, that they were aware of the possible discrepancies, or that they had any reason to question the veracity of Mr. Dietz's allegations concerning his experience.  Without such evidence, there can be no proof of pretext.  Fuentes, 32 F.3d at 765.

The plaintiffs' next attempt to prove pretext must also fail.  The plaintiffs indicate that Mr. Dietz was terminated from his employment at Dart after admitting to having made a racial slur against another employee.  The fact that Mr. Dietz was terminated for cause after his promotion cannot establish pretext.  As discussed above, an individual's performance after the promotional decision at issue is entirely irrelevant to a pretext analysis.  See Bruno v. W.B. Saunders Co., 882 F.2d at 768.

Finally, the plaintiffs attempt to show pretext by claiming "underrepresentation" of minorities in the defendant's supervisory ranks.  The scant evidence cannot create a genuine issue of material fact because there is no analysis to support the bald allegations.  "Raw numerical comparisons," unaccompanied by "any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period" are insufficient to create a fact issue as to pretext, because no conclusion can be drawn from them.  Ezold, 983 F.2d at 543.  Here, without any such analysis, the plaintiffs' allegations of underrepresentation cannot create a genuine issue of material fact as to pretext.

This court's task is not to second guess an employer's employment decisions but, rather, to determine whether an illegal discriminatory purpose motivated the promotional decisions in question.  See Ezold, 983 F.2d at 525 (district courts are not to sit as

"members of an employer's promotion board," reviewing an employee's subjective qualities).  "The factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  <u>Fuentes</u>, 32 F.3d at 765.  What may be perceived as a mistake in judgment is insufficient to overcome summary judgment in the absence of evidence sufficient to compel a conclusion that the defendant's reason was "so plainly wrong that it could not have been the real reason" for the decision.  <u>Keller</u>, 130 F.3d at 1109.  Here, the defendant's decision to rely on one employee's experience over that of another employee is the type of business judgment the courts should not second-guess in employment discrimination cases.  Because there is no evidence to create a genuine issue of material fact as to whether any of the defendant's employment decisions discussed above were discriminatory, I will grant summary judgment in favor of the defendant.

An appropriate Order follows.